737 S.E.2d 473

The STATE, Respondent,

v.

Gregory DANIELS, Appellant.

Appellate Case No.2010–159728.

No. 27180.

Supreme Court of South Carolina.

Heard May 3, 2012.

Decided Oct. 10, 2012.

Appellate Defender Tristan M. Shaffer and Deputy Chief Appellate Defender Wanda H. Carter, both of South Carolina Commission on Indigent Defense, of Columbia for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. Mcintosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Brendan Jackson McDonald, all of Columbia, and Solicitor Edgar Lewis Clements, III, of Florence, for Respondent.

Justice PLEICONES.

Appellant was convicted of murder and possession of a weapon during a crime of violence and received concurrent sentences of life (murder) and five years (weapon). On appeal, he alleges the trial judge committed reversible error in charging the jury that they were acting "for the community" and that their verdict "will represent truth and justice for all parties that are involved." We agree that these charges are erroneous, but because appellant did not properly preserve his issues for appeal, we affirm.

## FACTS

The victim was shot at about 4:30 am on a Florence street. A witness who was to meet the victim testified that she heard a single gunshot and saw a person dressed in black clothing running away from the scene. There was testimony that appellant and the victim had argued at Shavonne's party. Shavonne did not observe the two fighting, but testified she was on the phone with the victim right before he was shot, and that he told her he was being followed by a man he had argued with at her party. Another witness testified that appellant had told him he had been hired to kill the victim. Appellant told this witness he had "done it" about an hour after the victim was killed.

Appellant and his girlfriend checked into a motel at about 5:35 am on the day of the murder. Excerpts from letters written to the girlfriend following appellant's arrest were introduced at trial. These letters suggested what she should tell people to give him an alibi. In one, he pointed out the

absence of physical evidence to convict him, and in another asked her to contact his lawyer and suggests what to say, including the instruction that "it will help me and my bond hearing [sic] you are who I was with when they found him ..." In short, while the State's case lacked forensic and eyewitness evidence, there was nonetheless substantial evidence that appellant murdered the victim.

At the pre-charge conference, appellant objected to the trial judge's inclusion of a charge that "You and I are acting for the community and that is why we must see to it that the trial is fair and the verdict is just." Appellant contended the "acting for the community" language was akin to a solicitor's improper golden rule argument, but did not object to the "fair and just" portion of this proposed charge. The judge declined to alter the "acting for the community" language. Appellant also objected to a different part of the proposed charge, which included the statement "[E]veryone is entitled to justice in this case," arguing that charge diluted the State's burden of proof. The judge agreed to omit this "everyone" charge.

The jury was charged on the presumption of innocence and the State's burden of proof beyond a reasonable doubt. Later, they were charged "You and I are acting for the community," and that "This court is of the confirmed opinion that whatever verdict you reach will represent truth and justice for all parties that are involved in this case." Appellant renewed his pre-charge objection, but made no additional complaint about the charge.

## ISSUES

1. Did the trial judge's charge include an improper "Golden Rule" instruction?
2. Did the trial judge's charge improperly shift the State's burden of proof or dilute it?

## 1. Golden Rule

Appellant argued to the trial judge that to the extent the jury was to be instructed that it and the judge were acting for the community, the charge was erroneous because it was akin to an improper Golden Rule argument. The judge disagreed. We affirm.

A 'Golden Rule' argument is one in which the jurors are asked to put themselves in the victim's shoes. It is improper because it is meant to destroy the jury's impartiality, and to arouse passion and prejudice. *Brown v. State*, 383 S.C. 506, 680 S.E.2d 909 (2009). A charge that the jury is acting for the community, however, is not similar to a Golden Rule argument in that it does not ask the jury to consider the victim's perspective. While appellant has not shown reversible error here, we caution the trial judge to restrict his jury instructions to matters of law.

## 2. Burden of Proof

On appeal, appellant contends the jury charge unconstitutionally shifted the burden of proof. He specifically objects to the part of the charge in which the judge stated it was his "confirmed opinion" that the verdict would represent "truth and justice for all parties." To the extent appellant now complains about the "confirmed opinion" part of the charge, he is improperly attempting to expand on appeal the scope of his objection below. *E.g., State v. Meyers*, 262 S.C. 222, 203 S.E.2d 678 (1974). There was no objection to the "confirmed opinion" language at the charge conference, and appellant stood on his pre-charge objection after the jury instructions were given. It is axiomatic that an objection to a jury charge may not be raised for the first time on appeal. *E.g. State v. Rios*, 388 S.C. 335, 696 S.E.2d 608 (Ct.App.2010); Rule 20(b), SCRCrimP.

Appellant also now argues the trial judge erred in charging the jury that their verdict would represent the "truth and justice for all parties."[1] The State contends that there was no contemporaneous objection made at trial to this "truth and justice for all" language in the charge. We agree. It is axiomatic that a party cannot raise an objection to a jury charge for the first time on appeal. *State v. Rios, supra;* Rule 20(b), SCRCrimP.

---

1. Appellant had objected to a different proposed charge at the pre-charge conference, that "Everyone is entitled to justice in this case." The judge agreed not to give this charge, and a review of the record shows that he did not.

■ Although the issue is not preserved, we instruct the trial judge to remove any suggestion from his general sessions charges that a criminal jury's duty is to return a verdict that is "just" or "fair" to all parties. Such a charge could effectively alter the jury's perception of the burden of proof, substituting justice and fairness for the presumption of innocence and the State's burden to prove the defendant's guilt beyond a reasonable doubt. Moreover, to a lay person, the "all parties involved" in a criminal case may well extend beyond the defendant and the State, and include the victim. These inaccurate and misleading charges risk depriving a criminal defendant of his right to a fair trial.

## CONCLUSION

Appellant's convictions and sentences are

**AFFIRMED.**

Acting Justice E.C. BURNETT, III, concurs.

TOAL, C.J., concurring in result in a separate opinion in which KITTREDGE, HEARN, JJ., and Acting Justice E.C. BURNETT, III, concur.

Chief Justice TOAL.

I concur in the result reached by Justice Pleicones, but writing for a majority of the Court, find that Appellant's burden-shifting arguments are preserved. The adequacy of the trial court's entire overall instruction cured any possible constitutional deprivation. In addition, the State presented overwhelming evidence of Appellant's guilt, rendering any error in the jury instruction harmless.

## I. PRESERVATION

■ At trial, defense counsel objected to portions of the trial court's proposed jury instruction. First, defense counsel took exception to the trial court's proposed statement that "everyone is entitled to justice in this case."

Defense Counsel: We would argue that this is burden shifting. The fact that we don't feel like the state is necessarily entitled to justice. Instead, they have the bur-

den of proving defendant guilty beyond a reasonable doubt. And we would cite *Cage v. Louisiana* [498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)], which suggest that the jury instructions that dilute the burden of proof on the government prove [sic] beyond a reasonable doubt violate due process and constitute reversible error.

. . . .

The Court: I was going to say why isn't the State entitled to justice just as any defendant who comes into court is entitled to justice. Being entitled to justice doesn't remove a burden or lessen a burden. I am going to note your exception to that, but. . . .

The trial court then agreed to remove the objectionable language:

But it's fairly—you know, that paragraph you are referring to where it starts with that everyone is entitled to justice, I will take that out and just put your verdict in this case cannot be based on sympathy, compassion or prejudice, just doesn't seem to be that big a deal.

However, the trial court issued a jury instruction containing substantially similar language:

Your verdict in this case is not to be based on sympathy, compassion, prejudice or some other emotion or other consideration that is not found in the evidence. This court is of the confirmed opinion that *whatever verdict you reach will represent truth and justice for all parties that are involved in this case.*

(emphasis added).

■ Defense counsel also objected to the trial court's proposed language that the judge and jury were "acting for the community," and argued that this statement asked the jury to act as the "conscious of the community, similar to a golden rule argument." The court refused to remove this language from his instruction, "I'm going to note your exception to the language, I'm going to leave that language in."

The Court then stated the following during his instruction:

You are not called to serve as jurors very often. And the proper performance of the duty requires each of you to reach the hithe [sic] of freeing your mind of all improper

influences. You and I are *acting for the community* and that is why we see to it that this *trial is fair and the verdict is just.*

Following the completion of the jury instructions, the court referenced defense counsel's objections:

The Court: Are there any exceptions or objections to the Court's charge by the State?

The State: No sir.

The Court: And by [defense counsel] other than what we discussed during the . . .

Defense Counsel: That's all, Your Honor.

The Record clearly demonstrates that Appellant did not raise the propriety of the jury instructions for the first time on appeal, but objected to the offensive language both before and after the trial court delivered his instruction. Thus, Appellant's objections were properly preserved for this Court's consideration on appeal, and consequently, we must address the critical burden shifting issue.[2]

## II. BURDEN SHIFTING

 While I agree with Appellant's argument that the jury should not have been instructed that their verdict would represent truth and justice for the parties, this Court must consider instructions as a whole, and "if as a whole they are free from error, any isolated portions which may be misleading do not constitute reversible error." *State v. Aleksey,* 343 S.C. 20, 27, 538 S.E.2d 248, 251 (2000). The standard of review when considering an ambiguous jury instruction is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution. *Id.* at 27, 538 S.E.2d at 251 (citing *Estelle v. McGuire,*

---

2. The trial court's instruction that the jury is "acting for the community" is dangerous, and has all the earmarks of a "Golden Rule" argument. While it may not directly instruct the jury to place themselves in the victim's shoes, a charge to "act for the community" carries the same connotation and effect. However, because of the overwhelming evidence of Appellant's guilt, discussed *infra,* any "Golden Rule" error harmless. *See Vasquez v. State,* 388 S.C. 447, 468–69, 698 S.E.2d 561, 572 (2010) ("Furthermore, even if the solicitor did make an improper 'Golden Rule' argument, I would find the error harmless in light of the enormity of the evidence against Petitioner.")

502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). Under this standard, the trial court's improper statements do not require reversal.

In *Aleksey,* this Court addressed whether a trial court's instruction shifted the burden of proof to the defendant. In that case, the trial court issued a complete and proper instruction on reasonable doubt, the presumption of innocence, and the State's burden of proof. *Id.* at 26, 538 S.E.2d at 251. The trial court then instructed the jury to weigh the credibility of witnesses as follows:

> Ladies and gentlemen, throughout this entire process, you have but one single objective, and that is to seek the truth, to seek the truth regardless of from what source that truth may be derived. Now, all of these things, ladies and gentlemen, you will consider, bearing in mind that you must give the defendant the benefit of every reasonable doubt.

*Id.* at 26, 538 S.E.2d at 250.

The Court *in Aleksey* relied on *United States v. Gonzalez–Balderas,* 11 F.3d 1218 (5th Cir.1994), in analyzing a contested jury charge. In *Gonzalez–Balderas,* the district court instructed the jury: "Remember, at all times, you are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in this case." *Id.* at 1223. The defendant argued that instructing the jury that its "sole interest is to seek the truth" diluted the reasonable doubt standard of proof. *Id.* The Fifth Circuit Court of Appeals disagreed:

> As an abstract concept, "seeking the truth" suggests determining whose version of events is more likely true, the government's or the defendant's, and thereby intimates a preponderance of evidence standard. Such an instruction would be error if used in the explanation of the concept of proof beyond a reasonable doubt. The district court, however, did not use it in this way. Rather, the trial court began its instructions with a clear definition of the government's burden of proof in which it repeatedly stated that the defendant could not be convicted unless the jury found that the government had proven him guilty beyond a reasonable doubt.

*Id.*

Similarly, the trial court in *Aleksey* issued complete and proper reasonable doubt and circumstantial evidence charges.

Although that trial court's statements regarding witness credibility were improper, this Court held that this did not taint the overall instruction. Thus, it was not reasonably likely that the jury applied the instructions in a manner inconsistent with the notion that the State has the burden of proof beyond a reasonable doubt. *Id.* at 28–29, 538 S.E.2d at 252.

In the instant case, the trial court included several improper statements as part of his jury instruction. However, the trial court prefaced those remarks with full and adequate instructions on reasonable doubt. It is troubling that the trial court concluded his jury instruction with statements that could have distracted the jury from their core functions: to examine evidence and make factual determinations, weigh credibility, and perhaps most importantly, decide whether the State has proven its case beyond a reasonable doubt. The injection of extraneous language only serves to distract the jury from performing their critical role. However, despite the trial court's mistake, the instruction as a whole properly conveyed the law to the jury and it is not reasonably likely that the jury acted in contravention of the reasonable doubt standard. *See Aleksey*, 343 S.C. at 29, 538 S.E.2d at 252–53 (finding reversal not required when the trial court's improper instructions were given in the context of witness credibility and not reasonable doubt).

Furthermore, unconstitutional burden shifting does not result in reversible error when that error was harmless beyond a reasonable doubt. *Rose v. Clark*, 478 U.S. 570, 579–80, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Tate v. State*, 351 S.C. 418, 426, 570 S.E.2d 522, 526 (2002).

The State presented substantial circumstantial evidence that Appellant committed the crime charged. One witness testified that, as the result of a "drug deal went bad," Gary Bostic hired Appellant to kill the victim for $1,000. This witness testified that Appellant told him four or five times that he planned to commit the crime. The witness stated that he and Appellant watched a news report regarding the murder, and that following the conclusion of the report, Appellant admitted to the murder.[3] The witness's girlfriend corroborat-

---

3. Bradley admitted that he faced pending federal charges for trafficking cocaine, but received no deal in exchange for his testimony, and only hoped to help himself in federal court.

ed his testimony. She testified that she was present when Appellant watched the news report, and that she also heard Appellant state that he murdered the victim. The State also presented evidence that between September 5, 2008, the day of the murder, and September 9, 2008, Appellant and Bostic called each other forty-one times.

The most revealing evidence presented by the State consisted of actual letters Appellant wrote in which he attempted to convince his girlfriend to provide him with an alibi.

Appellant's girlfriend testified that she saw Appellant on the Thursday evening of September 4, 2008, at approximately 7:30 or 8:00 p.m., and the next time she saw him was at 5:30 a.m. the morning of September 5. On that morning, Appellant picked her up in a van driven by a man named Gary, and Appellant and his girlfriend checked into a motel. Following their check-in, Appellant left and returned some time later with a rental car. Appellant then drove his girlfriend back to her residence, and informed her that he would be changing his phone number that day, and called her later that day from the new phone number.

The State introduced letters authored by Appellant, which sought to persuade his girlfriend to change her version of the events of September 4 and 5, 2008.

In a letter from October 2008, Appellant wrote:

They aint got no gun, no bloody clothes, no shells, nothing ... those are the main things they need to actually convict me it don't matter how many people say I did it or we argued the time that they say this happened. I told u that when we went to the room. Remember I said we was [sic] together at the settin [sic] up. But you told them u[sic] was sleep and I came and pick up [sic] in a van. My people told me that if u[sic] tell my solicitor that u will give him or her a statement saying we were together then they will give me a bond.

In another undated letter, Appellant wrote:

Someone told me how u[sic] can help me getting [sic] out of here. I don't know what u[sic] told them people but all I need is for u[sic] to say is I was with you at morning noon and night.

In another letter dated October 2008, Appellant acknowledges that his version and his girlfriend's version of the events are not similar:

Our stories are not the same. I told them we left off Carver Circle in a green van cab with a [sic] old driver. We were on the computer. But I will tell them I was still there playing dominoes u[sic] went home to get clothes and I came and got u[sic] from there. No times though ... Make sure dude no [sic] this story. State Taxi....

On November 16, 2008, Appellant wrote:

But anyways I need you to call this number ... and talk to ... my lawyer. Tell him that you are my girl and we were at the room during the time they said that this occurred. You can still tell him that I picked you up in a van and we went to the room but tell him that you were waiting on me at your sisters [sic] house but you left because I took to [sic] long. If they ask you a time just say you don't know what time it was but you were asleep and we was at the room sleep when the report on the news said at 5:00 a.m. But anyways you don't have to but it will help me at my bond hearing. You are who I was with when they found him.

By February 2009, Appellant became desperate for his girlfriend to provide a false alibi:

But your statement could hurt me in court because they saying you told them that it was not a taxi and it was a young dude driving the van and also that you was sleep and I was on the phone talking to somebody about dude but that has got to be when my phone started ringing and that I left you and didn't come back until 6:00 am but they said dude was dead at 5:17 a.m. and the receipt from the room show us checking in at 5:34 a.m. but the clerk saying he didn't see me but to cover that up I'll just say I was smoking a cigarette.

On June 14, 2009, Appellant admits that a man named "Gary" drove him to the hotel following the murder:

Call 617–6919 and tell Gary that you calling [sic] for me and let him know that ... said he will take $2,000 and come get

me out tell him my mama need $1,000. *That's who ...
dropped us off at the room.*
(emphasis added).

These letters clearly demonstrate that Appellant could not
account for his whereabouts at the time of the victim's mur-
der. His attempts to pressure his girlfriend to provide a false
alibi, and the testimony of two individuals who witnessed his
confession provided the jury with substantial circumstantial
evidence of his guilt. Put another way, the circumstances
proven are consistent with each other, and when taken togeth-
er, point conclusively to the guilt of Appellant to the exclusion
of every other reasonable hypothesis. *State v. Hernandez,*
382 S.C. 620, 626 n. 2, 677 S.E.2d 603, 606 n. 2 (2009) (citing
*State v. Edwards,* 298 S.C. 272, 274–76, 379 S.E.2d 888, 889
(1989)). Thus, based on the overwhelming evidence of guilt
presented to the jury, the trial court's erroneous instructions
could not have contributed to the guilty verdict. *See Lowry v.
State,* 376 S.C. 499, 509, 657 S.E.2d 760, 765 (2008) ("From this
perspective, in order to conclude that the error did not con-
tribute to the verdict, the Court must 'find that error unimpor-
tant in relation to everything else the jury considered on the
issue in question, as revealed in the record.'") (internal cita-
tion omitted).

## III. CONCLUSION

As a final note, although no constitutional error occurred,
the trial court's inappropriate statements in this case came
close to jeopardizing the legitimacy of the trial. Judges and
juries are critical actors in our judicial system. Jurors are
sworn to declare the facts of the case as they are proved from
the evidence placed before them. 50A C.J.S. *Juries* § 1
(2004). The very term "jury" connotes a deliberative body of
persons. *Id.* A judge sits as a public officer, who presides
over, conducts, and administers the law by virtue of the office,
and does so cloaked in judicial authority. *Id.* Judges § 7
(2004). Judges and juries are not, as this trial judge put it,
"in it together." While their functions may act as a comple-
ment to one another, it is erroneous to imply that they
somehow work hand in hand, and any blurring of their roles
serves as an unnecessary and improper distraction.

Judicial instructions to the jury in a criminal case that
"whatever verdict you reach will represent truth and justice

for all parties," that "we must see to it that the trial is fair and the verdict is just" and that you and I are "in it together," may seem at first blush to be simply harmless phrases intended to put the jury at ease and portray the judge as a "regular guy." However, the constitutional framework governing criminal trials is a highly technical body of law developed by the United States Supreme Court and by state courts operating under the Supreme Court's guidance. It is inappropriate to jeopardize the constitutionality of a trial by instructing the jury in this way.

It is critical that jurors understand the proper application of the reasonable doubt standard. That standard does not charge the jury with ensuring justice for all of the parties. Justice Pleicones correctly notes that this language could result in jurors substituting concepts of justice or fairness for the State's constitutional duty to prove guilt beyond a reasonable doubt. Thus, I join the Justice Pleicones's admonition to the trial court to restrict his jury instructions to matters of law, and refrain from issuing instructions which run the risk of depriving defendants of their right to a fair trial.

**AFFIRMED.**

KITTREDGE, HEARN, JJ., and Acting Justice E.C. BURNETT, III, concur.